**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | **CRIMINAL NO. 21-CR-30048-MGM** |
| **v.** | ) | |
| | ) | |
| **JESSICA LOTTO,** | ) | |
| **Defendant** | ) | |

**DEFENDANT'S SENTENCING MEMORANDUM**

*"The greatest glory in living lies not in never falling,*
*but in rising every time we fall."*

Nelson Mandela

I.    **INTRODUCTION**

Jessica Lotto has dedicated the vast majority of her adult life to helping others, not only working as a Registered Nurse and later on as a Certified Nurse Practitioner, but over the years Jessica has volunteered her time with organizations such as HELPS International (providing clinical nursing to indigent peoples of Guatemala), Kachin Women's Association Of Thailand (teaching reproductive health classes for Kachin women), and Proyecto ADAMES (providing clinical nursing for labor and delivery in the Dominican Republic). The youngest of three children, Jessica, who was diagnosed with Depression and Attention Deficit Disorder at the age of 14, was both motivated and damaged from growing up in the shadows of her two, overachieving, sisters. PSR ¶¶45, 56.  A similar dichotomy existed in Jessica's relationship with her parents, both of whom are licensed professionals that emphasized

education, hard work, and compassion for others, but at the same time effectively normalized the model of a "high functioning addict" (her father, David, would smoke pot daily, and her mother Norah, would drink anywhere from a half, to a full, bottle of wine every evening). See PSR ¶44.

Throughout high school and college Jessica embraced her parent's model, using drugs socially yet maintaining a fully functioning lifestyle. See Exhibit A, 1. However, in 2009, shortly after obtaining her first nursing degree, Jessica moved out to California and fairly quickly fell from grace, becoming addicted to opiate painkillers. See PSR ¶59. After having to go to the hospital for a blood infection, Jessica detoxed, began medication assisted treatment (MAT) in the form of Suboxone, and committed herself to sobriety. She was able to remain opiate free and live a life of purpose, with no slips, for almost ten years. PSR ¶59.

In July of 2015, after obtaining her Master of Science in Nursing (MSN) at California State University in Los Angeles and falling in love with her fiancé, Joseph Kickery III, the couple returned to Pittsfield to help care for Ms. Lotto's aging parents. PSR ¶ 52, 63.  Ms. Lotto began working as a surgical nurse practitioner at the local hospital, Berkshire Medical Center ("BMC"). On October 19, 2017, the couple's first daughter, Evelyn Kickery, was born. PSR ¶52. In February of 2018, Jessica, having been off her mental health medications as well as her Suboxone for approximately 18 months, returned to work at BMC. By the fall of 2018, Jessica had started using opiates again. PSR ¶60, Exhibit A, 1. On February 27, 2019, Jessica hit an unfathomable bottom when she was caught diverting fentanyl from a BMC patient's intravenous line. PSR ¶60. She now stands convicted of 21 U.S.C. § 843(a)(3), Acquiring a Controlled Substance by Fraud, Deception, and Subterfuge.

Fortunately, Jessica Lotto has made huge progress in climbing her way back up from that low point. Within 48 hours of being confronted, Jessica began a home detox, under the guidance of a psychiatrist. She has subsequently involved herself in a tremendous amount of programing and support groups, a large portion of which she began on her own accord, prior to becoming aware that she was going to be charged criminally[1]. Jessica regularly attends meetings in organizations such as the Women's Recovery Support Group, the Berkshire Healthcare Professionals Recove1y Group, and Relapse Prevention. PSR ¶62. This is in addition to attending two to four AA/NA meetings weekly. Jessica also participates in the Suboxone maintenance program at the Brien Center in Pittsfield and attends private therapy.

Initially, after getting clean, Ms. Lotto was accepted into BMC's Employee Assistance Program ("EAP") and allowed to return to work. However, when Federal Investigators informed BMC Administrators that they were conducting an investigation into what happened, Ms. Lotto was asked to resign. A few days later, her nursing license(s) were suspended. However, Ms. Lotto did not give up. Instead, she applied for and was accepted into the Board of Registration in Nursing's, Substance Abuse Rehabilitation Program ("SARP"). After approximately seven months of strict adherence to the SARP Program (See Exhibits K, L, M, and N) Jessica was granted a "limited reinstatement" of her practice privileges. Ms. Lotto immediately applied for and was hired as an Infection Control Nurse at Fairview Commons in Great Barrington. This was during the height of the COVID-19 Pandemic, a time when a lot of nurses and medical staff, especially those employed in nursing homes, were refusing to return to work. However, in a true showing of her character, Jessica jumped into the position with both feet and literally saved lives. (See Exhibits B1, and E1).

---

[1] Ms. Lotto did not receive a Target Letter until May 19, 2021.

On December 29, 2022, Jessica gave birth to her second child, a healthy baby girl, Vera Kickery. On March 1, 2023, Jessica will have four years of sobriety from opiates. Additionally, she has completed three of the four stages of the Restorative Justice Program, and on Wednesday, February 15, 2023, Ms. Lotto is scheduled to complete the fourth stage, a restorative conference with two of the Berkshire Health Systems employees that were affected by her actions. (See Exhibit V). In light of her demonstrated history of achievement, the obvious connection between her drug addiction and the instant criminal conduct, and her success in overcoming her addiction while returning to legitimate work, and now being the primary caregiver for 2 young daughters, incarcerating Ms. Lotto for even a relatively short period of time is unnecessary to achieve the goals of sentencing and would only interrupt the positive path on which she is now traveling. See 18 U.S.C. § 3553(a) (requiring imposition of sentence that is "sufficient, but not greater than necessary" to accomplish sentencing goals).

Jessica Lotto is eligible for a probationary sentence of not less than 1 nor more than 5 years of probation because the offense is a Class E Felony. 18 U.S.C. § 3561(c)(l). PSR ¶76. Therefore, we ask this Court to sentence Ms. Lotto to probation for a term of 36 months, with the first six months to be served in home detention. Such a sentence, which is within the Guideline range, will provide her with both the structure and impetus to further the tremendous progress she has made since the low point of this incident. PSR ¶78.

II.   **FORMATIVE YEARS**

Jessica Lotto was born on May 21, 1985, in Pittsfield, Massachusetts. PSR ¶44. Her father, David Lotto, was a psychologist with a PHD in Clinical Psychology, and her mother, Norah Walsh, was a psychotherapist. PSR ¶44-47. They both grew up poor and as a result placed a lot of emphasis on education and hard work. Id.

4

Jessica was the youngest of three girls. Id. At the time of her birth, her two sisters

Anna and Leah were nine and five respectively. PSR ¶ 48-49. Both Anna and Leah were

naturally gifted when it came to academics. While Jessica, on the other hand, had to work a lot

harder than her sisters. PSR ¶45. Her parents would often criticize her when she fell short of

the standards set by her sisters. Id. Anna is now a Screenwriter in the Writer's Guild of

America union, while Leah is an attorney with the National Center for Law and Economic

Justice. PSR ¶45.

When she was 14, Jessica's parents noticed she was exhibiting symptoms of

depression. They arranged for her to start seeing a therapist, weekly at first, and then b-weekly

for several years. Jessica also began taking anti-depressant and anti-anxiety medications. She

continues to take those medications to date.

Jessica's grew up in a financially stable, middle class, environment in which both of

her parents worked.  PSR ¶44. From a young age, Jessica remembers her father smoking

marijuana daily and her mother drinking nightly – yet they both were still very successful.

Throughout high school and college Jessica embraced her parents' model. In high school

Jessica began experimenting with various drugs socially, but continued to maintain a solid

work ethic, good grades, and meaningful friendships. She served on the student counsel, made

the gymnastics team, and achieved high honors academically.

Beginning in 2006 Jessica started spending her summers doing volunteer work with

organizations like Kachin Women's Association Of Thailand, teaching reproductive health

classes for Kachin women, and Proyecto ADAMES, providing clinical nursing for labor and

delivery in the Dominican Republic. Her dedication to social justice was something she and

her sister Leah (the attorney), bonded over.

In 2008, after obtaining her Bachelor of Science degree in Nursing from the University of Massachusetts, Amherst, Jessica packed up her things and moved to California. Her oldest sister, Anna, had already been living out there for a few years, and was working as a screenwriter in Los Angeles. Jessica had planned to only stay with her sister for a few months, but as way leads unto way, she ended up living with Anna for almost four years.

III.    **CALIFORNIA – A STUMBLE AND RECOVERY**

In 2009, approximately a year after moving to California, Jessica's recreational use of opiate painkillers turned to daily use. From there, it didn't take long before Jessica was shooting the pills intravenously. By the Spring of 2009, Jessica had contracted a blood infection that landed her in the hospital, and probably saved her life.

Jessica, who was only 23 years old at the time, knew this was not the life she wanted. While in the hospital, she started medication assisted treatment ("MAT") with Suboxone. Once discharged, Jessica began seeing a therapist regularly. She also started to attend peer support meetings whenever she could.

In January of 2010, having gotten several months of sobriety under her belt, Jessica began looking for work as a Nurse. She was able to get a job at the University Of Southern California's Keck Hospital, as a Lung Transplant Nurse Coordinator. In the summer of 2011, Jessica went back to her roots and decided to volunteer with the organization "HELPS International", providing clinical nursing to indigent peoples of Guatemala. Jessica loved the work because in her words, she really felt like she was making a difference, helping people who could not afford it.

Later that same year, while back in Massachusetts visiting family, Jessica re-connected with an old friend from high school, Joseph Kickery, III.  They began a long-distance

relationship and in late 2012, Joseph moved out to Los Angeles. The two of them got an apartment together. At the time, Jessica was still employed with the USC Keck Hospital, but really wanted to go back to school to get a master's degree. With Joseph by her side, Jessica felt it was a good time to give it a try. She applied, and got into the master's program at California State University, in Los Angeles.

In 2013, Jessica began attending classes at Cal. State, while continuing to work at Keck Hospital. In 2015, Jessica graduated from Cal. State University with a Master of Science degree in Nursing (MSN). Jessica and Joseph subsequently moved back home, to Massachusetts, to help care for her aging parents - which she still does. Upon returning to the Berkshires, Jessica began working at Berkshire Medical Center ("BMC") as a Nurse Practitioner in Perioperative Care. Shortly thereafter her and Joseph got engaged.

## IV.   <u>**THE BIG FALL – THE INSTANT OFFENSE**</u>

In 2016, after having moved back home to Pittsfield (from Los Angeles), and with approximately seven years of sobriety under her belt, Jessica and her fiancé, Joseph Kickery III, made the decision to try start a family. In order to give themselves the best chance for a healthy child, Jessica made the decision to wean off Suboxone and discontinue several other medications she had been taking, including her antidepressant. On October 19, 2017, the couple's first daughter, Evelyn Kickery, was born and she was perfect! Jessica, who had been working at Berkshire Medical Center ("BMC") since November of 2015, took three months of maternity leave before returning to her first love, nursing. As she was still breast feeding, Jessica chose not to restart her antidepressant medication (as well as her other psychiatric medications). After a few months, the demands of Jessica's work and home life, combined

with her lack of sleep and emerging postpartum, took their toll and Jessica began using opiates again. Towards the end of 2018 / beginning of 2019, Jessica had fallen to, what was, a previously inconceivable bottom. On February 27, 2019, Jessica was caught, by a fellow nurse, diverting fentanyl from a BMC patient's intravenous line. That same day, Jessica met with BMC's Chief Nursing Officer as well as their Vice President of Human Resources. After briefly trying to deny what happened, Jessica acknowledged that she had a problem and asked for help. She agreed to take a leave of absence in order to obtain substance abuse treatment. See Exhibit F- Berkshire Health Systems ("BHS") Corrective Action Notice.

V.       **RISING BACK UP – IT'S NOT EASY, BUT IT'S WORTH IT**

In has been almost 4 years since this incident occurred and, Jessica Lotto has, through tremendous effort, made tremendous progress. In less than 48 hours of being put on leave, Jessica began a home detox under the guidance of a psychiatrist. She then entered the Suboxone Maintenance Program at the Brien Center in Pittsfield which requires attendance of individual therapy sessions. (See Exhibit C-3). Jessica also began seeking out and attending a variety of support groups including, but not limited to the Women's Recovery Support Group, the Berkshire Healthcare Professionals Recove1y Group, and Relapse Prevention. PSR ¶62, also see (Exhibit E, 1-5).

Approximately three months after getting clean, Jessica was invited to enter BMC's Employee Assistance Program, and was eventually allowed to return to work on July 16, 2019. (See Exhibit F). However, this was a short-lived reprieve as on September 3, 2019, after BMC Administrators Federal Agents informed BMC Administrators that an investigation into Ms. Lotto's actions was under way. A few weeks later, the hits kept coming, and on September 26, 2019, Jessica received written notice from the Board of Registration in Nursing that she must

immediately cease any and all nursing practice and return all nursing licenses issued to her by the Board within one business day. (See Exhibit H).

By late September 2019, Jessica had been completely shut out by the once supportive hospital. Her co-workers, who had become like family over the previous 5 years, were told not to contact her, and all communications between Ms. Lotto and the hospital staff were now being conducted though their respective attorneys. Jessica was devastated - she was working so hard to stay on the right track but felt that her life was once again spinning out of control. As a result, Jessica checked herself into the Baystate Franklin Medical Center ("BFMC") on September 30, 2019. Although Jessica went to BFMC for mental health reasons, the psych unit team determined that Jessica would greatly benefit from a short-term residential substance abuse program. A major reason for this determination was the fact that Jessica had never been to an inpatient substance abuse treatment facility and the belief was that she could benefit greatly from Dialectic Behavior Therapy. (See Exhibit I).

On October 8, 2019, Jessica completed her inpatient stay at BFMC, and was discharged directly into Clinical Support Solutions ("CSS") 10-day inpatient program in Holyoke. See (Exhibit I). 10 days later, On October 18, 2019, Jessica received her Certificate of Achievement and Completion from CSS. (See Exhibit J). Upon being discharged from CSS, Jessica went home and began trying to put her shattered life back together. Initially she spent most of her time caring for and re-bonding with Evelyn, who had just turned two. Eventually, Jessica began the process of trying to unsuspend her nursing licenses. The only way to do so was to apply for and get accepted into the Board of Registration in Nursing's Substance Abuse Rehabilitation Program, more commonly known as "SARP".

On March 4, 2020, Jessica was accepted into SARP. The program requires a minimum three-year commitment from its participants, and is a completely confidential, voluntary, abstinence-based, "alternative to discipline" program for nurses. (See Exhibit K). It is designed to protect public health, safety, and welfare by establishing safeguards to maintain professional standards of nursing by monitoring participants' ongoing recovery and their return to safe nursing practice. (See Exhibits K and L). Over the next seven months, Jessica maintained strict compliance with her Consent Agreement for SARP Participation ("CASP"). (See Exhibit M). She was not only required to abstain from illicit substances but also alcohol and some over-the-counter medications as well. (See Exhibits M and N). In order to monitor participants, SARP would require them to not only take random blood and urine screens but would also require hair and fingernail samples be given, in order to comply with their drug testing policy. (See Exhibits M and N). Additionally, all participants are required to attend at least five substance abuse meetings per week. If after six months of strict compliance with the above-mentioned requirements, as well as several others, participants are permitted to petition SARP for a limited re-instatement of their licenses, and to return to the practice of nursing. (See Exhibits M and N). One of the limitations being the inability to administer narcotics. (See Exhibits M and N). It should be noted that during this time frame Jessica attended over 150 Support Group meetings. (See Exhibit O), had to call in daily for random drug screens (See Exhibit Q),  and took over 20 random drug screens with no positives for unlawful drugs  (these were in addition to the weekly screens she was required to take for participation in the Suboxone Clinic) (See Exhibit R).

Accordingly, on November 19, 2020, having complied with all the SARP requirements necessary for reentry into "monitored practice", Jessica's petition to the Board of Nursing for a

"limited reinstatement" of her practice privileges was approved. (See Exhibit P). This amendment provided Jessica with an opportunity to once again work, albeit in a limited capacity, in her chosen profession, nursing. This reprieve could not have come at a better time as the COVID-19 Virus was still ravaging the nation, and Jessica was feeling helpless having to sit on the sidelines instead of fighting on the frontlines.

On December 15, 2020, less than a month later, Jessica received the approval from SARP to begin working at Fairview Commons, a long-term care facility in Great Barrington, MA. (See Exhibit P). Again, this was during the height of the COVID-19 Pandemic, a time when nursing homes were considered one of the most dangerous places to be. Ms. Lotto was hired as an Infection Control Nurse at Fairview and was essentially tasked with Testing every single employee, resident, vendor, and contractor every 3 days. (See Exhibit B – 1). Coordinating life-saving antibody infusions, keeping scrupulous records, documentation, line lists of each case, called and checked in daily or sometimes more than daily with sick staff members, communicated with residents and their grieving, hysteric families.(See Exhibit B-1). According to Challis Adams, the director of nursing at Fairview Commons:

> Miss Lotto not only did her job as the description outlined, but she treated each person with the most humanistic, holistic touch that truly helped ease the devastation. I would often find her in full personal protective equipment (PPE) holding the hand of a vulnerable resident. The residents don't fully understand that Jessica is not their personal nurse. They are always asking for her. I frequently pull her from the office to come say hello to residents who call her their favorite. (See Exhibit B – 1).

While her position at Fairview was significantly below her licensing as a nurse practitioner, "Jessica served with grace and skill beyond expectation. Her leadership role during a facility wide Covid outbreak saved many lives, in comparison to other nursing homes in the area." (See Exhibit E-1).

Then on May 19, 2021, over a year and a half after the incident occurred, Ms. Lotto received a Target Letter informing her that she was the subject of an investigation.  Almost immediately Ms. Lotto, by way of Counsel, entered into plea negotiation with AUSA Dineen Jerrett in an attempt to resolve this matter prior to the completion of a presentation to the Grand Jury. Approximately 5 months later, an agreement was reached. As part of this plea agreement, AUSA Dineen Jerrett, required that Ms. Lotto surrender her Nursing Licenses prior to the plea date. We then filed the agreement with the Court and a hearing was scheduled for January 6, 2022. As a result, Ms. Lotto resigned from her position at Fairview Commons in December 2021, and surrendered her licenses a few days later.

On January 6, 2022, Ms. Lotto's waiver of her right to an indictment was accepted by the Court, and the Parties attempted a Rule 11(c)(1)(c), plea to a one Count Information charging Acquisition of a Controlled Substance by Fraud, Deception, and Subterfuge pursuant to 21 U.S.C. § 843(a)(3). This change of plea was stopped by the Court prior to completion of the colloquy, and Ms. Lotto was ordered released on pretrial conditions. After another attempt at a change of plea pursuant Rule 11(c)(1)(c), failed, the parties agreed to move forward without a plea agreement in place. On May 31, 2022, Ms. Lotto pled guilty to the one- Count Information. At the plea hearing Counsel explained that Ms. Lotto had applied for, but was denied, admission into the RISE Program. Your Honor then suggested that Ms. Lotto meet with Probation to see if an alternative program could be undertaken by Ms. Lotto, and as a result, she was granted entry into the Restorative Justice Program. Ms. Lotto's sentencing date was then scheduled for January, due to the fact that she was pregnant with her second child and her due date was  December 31, 2022. The sentencing hearing was then continued to February 17, 2023, due to the fact that Ms. Lotto was close to competition of the Restorative Justice

Program. As of the writing of this memorandum, Jessica has completed three of four stages of the program. (See Exhibit V). On February 9, 2023, Counsel received notice from AUSA Elianna J. Nuzum that stage 4, an individual restorative conference, has been scheduled for this Wednesday, February 15, 2023, in which Ms. Lotto will be meeting with two Berkshire Health Systems employees (a Doctor and a Physician's Assistant) who were both affected by her actions. See Exhibit V).

Given Ms. Lotto's exemplary, and continued, participation in and complete success with her treatment programs for almost 4 years, the notion of removing her from this community-based treatment and instead incarcerating her is antithetical to her continued recovery, unnecessary to protect the public, and a far greater burden on the public fiscally. See generally Justice Policy Instittue, "Treatment or Incarceration: National and State Findings on the Efficacy and Cost Savings of Drug Treatment Versus Imprisonment" (Jan. 30, 2004) [2]. On March 1, 2023, less than a month from today, Jessica Lotto will be four years sober from all opiates. She recently gave birth, via cesarian section, to a second beautiful daughter, Vera Kickery, and has almost completed her JTC Program run through the Tamer Center for Social Enterprise at the Columbia University Business School. (See Exhibit B-2). It is highly unlikely that, if sentenced to prison, Ms. Lotto will receive as effective treatment during her incarceration as she is receiving presently in the community. See Nat'l Ctr. On Addiction and Substance Abuse at Columbia University, Behind Bars II: Substance Abuse and America's Prison Population, 39 (2010) (noting study from 2006 that only 11.6% of inmates with substance use disorder receive treatment while incarcerated and fewer receive evidence-based services). And if sent to prison but then released, that process of reentry may well present

---

[2] (located at https://justicepolicy.org/research/treatment-or-incarceration-national-and-state-findings-on-the-efficacy-and-cost-savings-of-drug-treatment-versus-imprisonment/) (last visited February 13, 2023).

significant challenges to Ms. Lotto's ongoing recovery. See Begun et al., "Mental Health and Substance Abuse Service Engagement by Men and Women During Community Reentry Following Incarceration, 43 Adm Policy Ment. Health 207-218 (2016) (study showing persons with SUDs released from incarceration at high risk for relapse due to barriers for reengaging treatment, such as financial hardship, loss of insurance, eligibility problems). Not to mention the maximum time for supervised release for this Charge is only one year, as opposed to the three years of probation Ms. Lotto is asking this Court for.

VI.     **SENTENCING GUIDELINES – OBJECTIONS**

   A.  The Guideline Range Should Be 0 To 6 Months, As Opposed To 6 To 12 Months As Probation And The Government Contend..

As set forth in Ms. Lotto's Objections to the Presentence Report previously submitted to Probation, Ms. Lotto disagrees with the 6-to-12-month Guideline range calculation arrived at by Probation and agreed to by the Government. See PSR, Addendum, at 22-26. Ms. Lotto maintains that the correct Guideline range is 0 to 6 months. This disagreement stems from different views with respect to the Victim Related Adjustment of plus-two levels, for a vulnerable victim pursuant to U.S.S.G. § 3A1.1(b)(1).

In pertinent part, U.S.S.G. § 3A1.1(b), reads, "If the defendant knew or should have known that a victim of the offense was a vulnerable victim, increase by 2 levels." For purposes of subsection (b), "vulnerable victim" means a person (A) who is a victim of the offense of conviction and any conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct); and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct. Id. § 3A1.1 cmt. n.2. As such, in

order to apply the "vulnerable victim" enhancement, a sentencing court must first determine: (1) who the victim of the crime (or relevant conduct) is, (2) whether that victim was "unusually vulnerable", and (3) whether the defendant knew, or should they have known, of the victim's unusual vulnerability. United States v. Chin, 41 F.4th 16, 26 (1st Cir.), cert. denied, 143 S. Ct. 338 (2022).

Probation appears to contend, and the government seems to agree that either 1) the patient in this case was the victim of the crime of commission, or 2) that this Court should adopt the logic annunciated by the 5th Circuit in  United States v. Gieger, 190 F.3d 661, 664 (5th Cir.1999), that a § 3A1.1 adjustment is warranted where there is a "potential harm from" the defendant's relevant conduct. Addressing the first contention above, counsel would agree that the patient was indeed vulnerable, however it is BMC and not the patient who was the victim of the crime of commission. In this case, the Defendant, Ms. Jessica Lotto, pled guilty to one count of acquiring or obtaining possession of a controlled substance by misrepresentation, fraud, forgery, deception, or subterfuge, pursuant to 21 U.S.C.A. § 843. The elements of this offense include 1) the acquisition, 2) of a controlled substance, and 3) by way of misrepresentation, fraud, forgery, deception, or subterfuge. In the instant case, the controlled substance Ms. Lotto acquired, the Fentanyl, belonged to BMC (not the patient in question). Additionally, any and all deception, misrepresentation, or subterfuge employed by Ms. Lotto in the acquisition, or concealment, of the Fentanyl, was made to BMC employees, not the patient. In fact, based on a review of the discovery in this case, there is no indication that Ms. Lotto ever spoke to, or interacted with, the patient in question, much less that she utilized any fraud, deception, or misrepresentations against them. For these reasons, BMC, and not the patient, is the only victim of the offense of conviction.

Looking at Probations second contention above, that a § 3A1.1 adjustment is warranted in this case, because there was a potential for harm to the patient based on the Defendant's relevant conduct, however this interpretation as suggested by the 5th Circuit in <u>Gieger,</u> creates seemingly limitless potential  for application of the § 3A1.1 enhancement, and consequently undermines the Guidelines' explicit goals of reducing sentencing disparity and promoting proportionality. Unlike other guidelines, § 3A1.1 does not define "victim" as a standalone term. "In the absence of such a definition," we give the term "its ordinary or natural meaning." <u>FDIC v. Meyer</u>, 510 U.S. 471, 476 (1994). In legal usage, a victim is someone "harmed by a crime." Black's Law Dictionary 1798 (10th ed.2014). Counsel could find no First Circuit case which addresses the question of whether a defendant's "relevant conduct" could be used as a basis for an enhancement pursuant to § 3A1.1(b) where the suggested victim of that "relevant conduct" suffered no actual, or intended, harm.

While a myriad of other Circuits have addressed this issue and found that a showing of "actual or intended harm" is necessary for a "vulnerable victim" enhancement under U.S.S.G. § 3A1.1(b): see <u>United States v. Salahmand</u>, 651 F.3d 21, 29–30 (D.C.Cir.2011) (finding the vulnerable victim enhancement to be proper for a fraudulent physician, and distinguishing cases involving those who "suffered no injury at all," thus failing to "qualify as 'victims' under any definition"); <u>United States v. Anderson</u>, 85 F. Supp. 2d 1084, 1093 (D. Kan. 1999) (denying the adjustment because the government "failed to show that the patients were harmed in any way" from the defendant's Medicare kickback scheme); and <u>United States v. Shafer</u>, 199 F.3d 826, 831 (6th Cir. 1999) ( "a district court may not include "relevant conduct" in its sentencing calculation pursuant to § 1B1.3(a)(2) unless the relevant conduct at issue amounts to an offense for which a criminal defendant could potentially be incarcerated"), it appears that the 5th Circuit in <u>United</u>

States v. Gieger, 190 F.3d 661, 664 (5th Cir.1999) (finding a § 3A1.1 adjustment unwarranted because, in "contrast to other medical fraud cases within this Circuit in which patients suffered harm or at least potential harm from [a] fraudulent scheme, the patients here suffered no harm") is the only circuit to broadly define the enhancement to include persons  potentially harmed by a Defendant's relevant conduct, as opposed to potential harm from the crime of Commission.

In the case at bar, the acquisition of fentanyl by Ms. Lotto, via the top port junction of a patient's I.V. line, did not result in any harm, or intended harm, to the patient in question. Specifically, Ms. Lotto's actions did not result in the deprivation, or increased risk of deprivation, of any medication(s), including fentanyl, to the patient in question. Nor did her taking of the fentanyl result in any financial or emotional harm to the patient in question. Additionally, Counsel has attached as Exhibit S - S. BMC Infectious Disease Testing Results, that was provided to him in discovery. It is important to note that according to this chart, there was no increase in infection rates during the timeframe asserted by the Government that Ms. Lotto may have been diverting medication.

For these reasons, the Defendant asks this Court to adopt the majority of jurisdiction's logic that when looking at "relevant conduct", a showing of "actual or intended harm" as opposed to merely "potential harm" is required in order to apply the § 3A1.1, vulnerable victim enhancement.

B.  Even if this Court concludes that the correct Guideline range is 6 to 12 months, the Court can and should still impose a non-incarcerative sentence.

As this Court well knows, in *United States v. Booker*, the U.S. Supreme Court declared the U.S. Sentencing Guidelines to be advisory, rather than mandatory; while District Court judges "must consult those Guidelines and take them into account when sentencing," judges "are not bound to apply the Guidelines." 543 U.S. 220, 264 (2005). Thus, even if the Court

agrees with Probation and the Government that the proper Guideline range 6 to 12 months, the Court is permitted to impose a lesser sentence, including a non-incarcerative sentence. Indeed according to USSG §5Bl.l(a)(2), since the applicable guideline range is in Zone B of the Sentencing Table, the Court may impose probation with a condition or combination of conditions requiring intermittent confinement, community confinement, or home detention, as provided in USSG §5Cl.l(e).

VII.   CONCLUSION

For all of the above-stated reasons, a non-incarcerative sentence probation for a term of 36 months, with the first six months to be served in home detention, is "sufficient, but not greater than necessary" to accomplish the goals of sentencing. 18 U.S.C. § 3553(a). It is also the right thing to do. Ms. Lotto committed these offenses as a result of and to serve his severe addiction at a difficult point in her life, but she has gotten back up in impressive fashion. The sentence she recommends would enable her to continue on this path and regain the life of accomplishment she once had.

Respectfully submitted,

**JESSICA LOTTO**
By Her Attorney,

/s/ *Alexander Sohn*

Alexander Sohn, BBO #678908
Cohen Kinne Valicenti & Cook
28 North Street, 3rd Floor
Pittsfield, MA 01201
Cell: (917) 686-7979
Office: (413) 443-9399
Fax: (413) 417-2253
asohn@cohenkinne.com

Dated: February 15, 2023

Leah's Wedding





Jess. Mom and Dad



Jess, Joe and Evie



Evie Vera



Ellis' Baptisim



Grad School Group



Jess' Grad School Graduation




Dom. Rep. Charting          Dom. Rep PT pic          Guatemala HELPS



Dominican Republic Group photo

Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).


/s/ *Alexander Sohn*

_____

Alexander Sohn, Esq